IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SPRING CITY ACQUISITION CO., LLC, | |
| *Plaintiff,* | Civil Action File No.: |
| v. | 2:24-CV-0088-RWS |
| SPRING CITY DEVELOPMENT, LLC, | Jury Trial Demanded |
| *Defendants.* | |

**COMPLAINT**

Plaintiff Spring City Acquisitions, LLC ("SCA"), by and through its undersigned counsel, brings this action against Defendants Spring City Development, LLC ("SCD") and alleges as follows:

**The Parties, Jurisdiction, and Venue**

1. Plaintiff Spring City Acquisition Co., LLC ("SCA") is a limited liability company, organized and existing under the laws of the State of Georgia.

2. Defendant Spring City Development, LLC ("SCD") is a limited liability company, organized and existing under the laws of the State of Tennessee. Defendant SCD can be served with process by serving its registered agent, Pat Becker, at its registered office, 5103 Kingston Pike # 104, Knoxville, TN 37919.

1

3. This Court has jurisdiction over both the subject matter of this action pursuant to 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy exclusive of interest and costs exceeds $75,000.

4. Defendant SCD has agreed to submit to the jurisdiction of this Court pursuant to Section XII.6 of the Agreement of Purchase and Sale referenced in Paragraph 24 of this Complaint.

5. The venue of this action is proper in that this Court based upon Defendant SCD agreeing to venue pursuant to Section XII.6 of the Agreement of Purchase and Sale referenced in Paragraph 24 of this Complaint.

## The Agreements and Transactions

6. On or about February 13, 1958, the Tennessee Valley Authority ("TVA") agreed to transfer to Town of Spring City, Tennessee (the "Town") and quitclaimed to the Town all right, title, and interest in and to certain tracts of land described in that Transfer Agreement and located at 2109 New Lake Road, Spring City, Tennessee (the "Leased Property"), "for use as a municipal park for all members of the general public without distinction or discrimination. A true and correct copy of said Transfer Agreement is attached hereto as **Exhibit "A."**

7. On April 20, 2006, Defendant SCD entered into a lease agreement with the Town (the "2006 Lease"). The 2006 Lease was executed by Don Becker, Chief Manager, Defendant SCD. A true and correct copy of the 2006 Lease is attached

hereto as **Exhibit "B."** Attached to the 2006 Lease as Exhibit C was a list of improvements Defendant SCD intended to make to the Property.

8. Thereafter, on October 27, 2006, Defendant SCD made a presentation to TVA setting forth SCD's five-to-seven-year plan for the Property. Don Becker, Chief Manager of SCD, and Kelly Reed, Mayor of the Town, made the presentation.

9. By letter dated November 9, 2006, Donna Norton, TVA's Manager of the Watts Bar-Clinch Watershed Team, reacted to a presentation. In the opening paragraph of her letter, Ms. Norton wrote, "Unfortunately, the meeting confirmed our concerns that uses are taking place on the site and others are planned for the future that are inconsistent with the terms and conditions contained in the deed from the United States to Spring City (City)." A true and correct copy of the November 9, 2006 letter is attached hereto as **Exhibit "C."** The letter also demanded "the immediate halt" of all activities at the Property by both the Town of Spring City and the Seller.

10. In particular, TVA stated that it conveyed in the meeting that the use of the cabins, RV Sites, and additional lodging do not conform with the municipal park usage. TVA referenced a 1993 correspondence wherein it said the same. TVA specifically asked for an immediate halt to all activities that were inconsistent with

3

the usage restrictions of the Transfer Agreement and reminded the Town of TVA's ability to repossess the property from the Town.

11. By letter dated November 20, 2006, Mayor Reed wrote to David Harrell at TVA in which she made clear that she understood that TVA was calling into question various uses of the Property. In fact, the Town recommended a "Deed of Clarification" to allow for continued use and development of the Property. Defendant SCD is copied on the letter. A true and correct copy of the November 20, 2006 letter is attached hereto as **Exhibit "D."**

12. Thereafter, Defendant SCD was also copied on a series of letters in March 2007 concerning defaults under the 2006 Lease and the need for a deed modification in order for certain commercial uses to be permitted. For example, by email dated February 21, 2007, Mayor Reed confirmed to Penny Douglas that she discussed a deed modification with Don Becker and Tony Heard, both of whom are/were representatives of Seller. A true and correct copy of the February 21, 2007 email is attached hereto as **Exhibit "E."**

13. By email dated March 12, 2007, Mayor Reed advised David Harrell of TVA that the "developer" (i.e., SCD) had contacted the City several times regarding the use issue at the Property and that Seller was suffering financial loss due to continued use violations. Again, Defendant SCD was copied. A true and correct copy of the March 12, 2007 email is attached hereto as **Exhibit "F."**

14. By email dated March 20, 2007, Mayor Reed reiterated her understanding to David Harrell with TVA that a deed modification was required to permit certain ongoing uses of the Property that violated the 2006 Lease and the Transfer Agreement. A true and correct copy of the March 20, 2007 email is attached hereto as **Exhibit "G."** Mayor Reed complained that revenue was being lost and would continue to be lost until such deed modification was executed. Again, Seller was copied on the communication. Based on additional correspondence, Plaintiff understands that the mayor actually submitted a deed modification to TVA in December of 2007, but that deed modification was never finalized.

15. By email dated March 30, 2007, Mayor Reed to David Harrell confirmed that TVA sought significant revenue from the Town and Defendant SCD to allow for continued operations at the Property. A true and correct copy of the March 30, 2007 email is attached hereto as **Exhibit "H."** Defendant SCD was copied on said email.

16. One September 17, 2010, as the Town and Defendant SCD were negotiating a new lease, TVA wrote a letter to the new Mayor of the Town, Sue Garrison, in which it said, "While TVA has not taken legal action to prevent commercial uses in the past, TVA does not condone expansion of new commercial activities. Based on the draft lease, in particular Section 1, TVA is concerned that

the [Town] and/or lessee are planning future use that may not be compatible with the Transfer Agreement. Pursuant to Section 15 and Exhibits E and F of the draft lease, these details will be presented in a formal development or 'master plan' no later than December 31, 2010. Until we can review these plans, TVA is not in a position to evaluate if the proposed uses are compatible with the Transfer Agreement." A copy of the September 17, 2010 letter is attached hereto as **Exhibit "I."**

17. On page two of the September 17, 2010 letter, TVA specifically points out issues with the lease agreement the Town and Defendant SCD ultimately executed on October 1, 2010.

18. Plaintiff alleges on information and belief that the Town shared the September 17, 2010 letter with Defendant SCD.

19. The Town and Defendant SCD entered into an amended lease on October 1, 2010 (the "2010 Lease"). The 2010 Lease was modified to accommodate the issue identified in item 1 on page 2 of the September 17, 2010 letter.  Far from resolving any of the issues concerning how the commercial uses of the Property violated the Transfer Agreement, however, the 2010 Lease merely kicked the can down the road.  Nothing was resolved with TVA through the 2010 Lease, and the Town and Defendant SCD clearly knew of the continuing issues regarding uses that were forbidden under the Transfer Agreement.

6

20. In an email dated December 20, 2012, Russell D. Smith with TVA advised Vicki Doster, then Mayor of Spring City, that Defendant SCD's long-term development plan, Exhibit E to the 2010 Lease, was added to the 2010 Lease after TVA had had reviewed a draft of the lease and agreed to its terms. Mr. Russell explained that Exhibit E had not been seen by or approved by TVA and "did not align with TVA's Section 26a authority." Mr. Russell went on to write that the Town should seek TVA approval before beginning any shoreline construction activities. A true and correct copy of a chain of emails, containing the referenced December 20, 2012 email, is attached hereto as **Exhibit "J."**

21. Someone forwarded the December 20, 2012 email to Don Becker of Defendant SCD because on December 23, 2012, in the same email thread at page 2, Mr. Becker sent multiple emails to Tony Heard and Mayor Doster. Mr. Becker's email recites SCD historical challenges with the use restrictions from the Transfer Agreement that TVA insisted upon enforcing.

22. Between 2012 and November 2022, nothing changed with respect to the Transfer Agreement, the use restrictions from the Transfer Agreement, or TVA's apparent commitment to enforce those restrictions.

23. On or about June 29, 2022, Defendant SCD, as Seller, and Yonah Capital Ltd. Co. or its Assigns, as Buyer, entered into an agreement entitled the Agreement of Purchase and Sale (the "APA"). A true and correct copy of the APA

7

is attached hereto as **Exhibit "K."** Pursuant to the terms of the APA, the Buyer purchased, among other things, all of Defendant SCD's interest in the leasehold associated with the Property and all improvements thereon.

24. On or about November 22, 2022, the purchase of the assets contracted for in the APA was closed, and Plaintiff SCA and Defendant SCD entered into an agreement entitled the Assignment and Assumption of Lease (the "Assignment").

25. Sections IV.1 (e), (k) and (r) of the APA contain the following Representations and Warranties:

> (e) → This Agreement does not, and the Closing Documents will not, violate any provision of any judgment, order, injunction, decree, regulation or ruling of any court or any governmental body or agency, and will not violate or conflict with, result in a breach of, or constitute a default under any organizational documents of Seller, any note or other evidence of indebtedness or any mortgage, indenture, lease or other agreement or instrument to which Seller is a party or to which Seller or the Property is subject.
>
> (k) Seller has not received any written notice alleging that the Property is not in compliance with any applicable federal, state and local laws, regulations, ordinances and the like ("**Laws**") and Seller has received no written notice from any federal, state, county, municipal or other governmental authority of any violation of any law applicable to the Property (including, without limitation, any Environmental Law, and any fire, health, safety and building law, statute, code ordinance or regulation) (a "**Code Violation**") that has not been corrected to the full satisfaction of the issuing authority.
>
> (r) → All of the Due Diligence Materials delivered or made available by Seller to Buyer in connection with the Property are true, accurate and complete copies of such items in all material respects, and have not been updated or supplemented except to the extent such updates or supplements are included within the Due Diligence Materials. All of Seller's financial information contained in the Due Diligence Materials is correct and complete in all material respects and presents accurately the results of the operations of the Property for the periods indicated.

26. Taken together, Defendant SCD's commercial use of the Property and the representations in the APA that the APA did not violate any lease or other agreement and that all material due diligence materials had been disclosed to SCA,

misled SCA into believing that all then-current usages of the Property were in compliance with all existing leases and permits related to the Property.

27. Defendant SCA knew, or should have known, that the Town and SCD had to make adjustments to the Master Plan (Exhibit E referenced above) for the Property to comply with the terms of the Transfer Agreement and satisfy certain demands of the TVA.

28. Plaintiff was not aware, and Defendant SCD did not disclose, that the Master Plan contemplated by Plaintiff would be a violation of the Transfer Agreement and that TVA had repeatedly made SCD aware that certain similar improvements it had proposed in the past would not be permitted because they were non-compliant with the Transfer Agreement.

29. Pursuant to the Second Amendment to the Lease, SCD required SCA to submit its own Master Improvement Plan ("MIP") for the Property, and SCA was required to materially comply with the timeline for implementation of the MIP. Virtually all aspects of the MIP, however, are violations of the Transfer Agreement in that they are non-conforming commercial uses that TVA had made plain to SCA will not be permitted. SCD knew and was obligated to disclose to SCA pursuant to Sections IV.1(e) and (r) of the APA that all or most of the MPI uses were non-conforming and would not be permitted by TVA.

30. On November 22, 2022, Plaintiff also entered into an Assignment and Assumption of Lease (the "Assumption Agreement") with the Town and a Second Amendment to the Lease (the "Second Amendment"), which documents are attached hereto as **Exhibits "L"** and **"M,"** respectively.

31. Exhibit A to the Second Amendment includes all planned improvements to the project. When Plaintiff submitted this list to TVA and sought to apply for a revised 26(A) permit, TVA told Plaintiff it would need to talk with the Town. TVA then had a meeting with the Town during which TVA made it clear that it would not consider any proposed improvements absent a deed modification.

32. The only improvements included on Exhibit A to the Second Amendment that could be done without gaining additional permissions or that would not be a violation of the 26A permit are: upgrades to existing rental cabins, general clean-up, landscaping improvements, new signage, and installation of beach and picnic areas. In short, TVA has scrapped the plans which were the basis for SCA entering into the transaction.

33. Defendant SCD knew, or should have known, that Plaintiff's plans to make improvements to the Property were critical to Plaintiff's business plan for the Property.

34. Defendant SCD knew, or should have known, that TVA would not approve most of the improvements contained on Exhibit A to the Second Amendment because of TVA's history of issues with noncompliance with the Transfer Agreement.

35. Under the express terms of the Assignment, Defendant SCD indemnified Plaintiff from all claims, suits, causes of action, costs, indebtedness, obligations and other liabilities arising from or incurred as a result of the Lease (as that term is defined in the Assignment) prior to the date of the Assignment.

36. All of Plaintiff's obligations under its agreements with Defendant SCD have been satisfied or waived.

## COUNT I: BREACH OF CONTRACT

37. Plaintiff incorporates the allegations in Paragraphs 1 through 36 of its Complaint by reference herein.

38. "Due Diligence Materials," as that term is used in Sections IV.1 (r) of the APA, consists of those materials listed on Schedule 3.1 to the APA. Pursuant to Schedule 3.1, Due Diligence materials include the following:

*Schedules of threatened litigation or claims;

*Notices of breach or default under any material agreements;

*Citations and notices from received from governmental agencies;

*Correspondence with government agencies;

  *Material correspondence relating to material contracts; and

  *Any other documents viewed by the company as material to its business or prospects (financial or otherwise).

39. Pursuant to Section IV.1 (r) of the APA, Defendant SCD should have provided to Plaintiff all communications between it and the Town or it and TVA regarding any potential claims arising from violations of the use restrictions in the Transfer Agreement.

40. Pursuant to Section IV.1 (r) of the APA, Defendant SCD should have provided to Plaintiff all communications between it and the Town or it and TVA regarding any notices of default under the Transfer Agreement or violations of the use restrictions in the Transfer Agreement.

41. Pursuant to Section IV.1 (r) of the APA, Defendant SCD should have provided to Plaintiff all correspondence between it and the Town or it and TVA of any description or type.

42. Pursuant to Section IV.1 (r) of the APA, Defendant SCD should have provided to Plaintiff any internal communications within SCD, including communications among agents of the Company, meeting minutes, summary documents, and the like, related to the use restrictions of the Transfer Agreement, including any communications or other documents reflecting upon violations of those restrictions.

43. Pursuant to Section IV.1 (r) of the APA, Defendant SCD should have provided to Plaintiff any documents reflecting upon Defendant SCD's plans to improve the Property not pursued because use restrictions.

44. Defendant failed to deliver to Plaintiff all of the above-described Due Diligence Materials in breach of its obligations under the terms of the APA.

45. Seller is required to indemnify Spring/Buyer from and against the demands for compensation by the TVA as there is no question whatsoever that similar (if not identical) demands were made prior to the Assignment of the Lease of which Seller had knowledge.

46. Plaintiff has suffered significant financial damage from Defendant SCD's breaches of the representations and warranties of the APA and failure to disclose the prior and ongoing violations of the usage restrictions on the Property.

47. Defendant SCD is responsible for all of Plaintiff's damages and/or other losses under the indemnity provisions of the APA and applicable law since they resulted from Defendant SCD's actions (or failures to act) prior to the Assignment.

48. Defendant HRS has acted in bad faith and caused Plaintiff unnecessary trouble and expense by requiring Plaintiff to resort to litigation to recover the amounts sought herein. As such, pursuant to O.C.G.A. § 13-6-11,

Plaintiff seeks, and is entitled to recover, its costs of litigation, including reasonable attorneys' fees.

## COUNT II: FRAUD

49. Plaintiff incorporates the allegations in Paragraphs 1 through 36 of its Complaint by reference herein.

50. Defendant SCD represented to Plaintiff that there were no legal or contractual violations, threatened causes of action, allegations of noncompliance, or required approvals under the Lease or for operation of the Property.

51. Defendant SCD represented that it had delivered to Plaintiff complete and correct Due Diligence Materials applicable to the operation of the Property.

52. Many of Defendant SCD's representations and warranties were patently false when made, and Defendant SCD intentionally deceived Plaintiff regarding permitted uses of the Property to induce Plaintiff to enter into the APA and the Assignment.

53. The documents attached hereto and referenced herein make it crystal clear that as of the effective date of the APA and the subsequent closing at which the Assignment was executed and delivered, Defendant SCD had knowledge that the Property was being operated in violation of the Transfer Agreement.

54. The documents attached hereto and referenced herein make it clear that as of the effective date of the APA and the subsequent closing at which the

Assignment was executed and delivered, Defendant SCD was aware that new permitting or approvals were required for the continued operation of the Property, which required payment of significant amounts and ongoing revenue sharing with the TVA.

55. Plaintiff has suffered significant financial damage from Defendant SCD's fraudulent conduct as described herein and failure to disclose the prior and ongoing violations of the usage restrictions on the Property.

56. Defendant SCD, by its conduct described herein, has acted with reckless disregard of the rights of Plaintiff and with a specific intent to injure Plaintiff, entitling Plaintiff to recover punitive damages from Defendant in an amount informed by the enlightened conscience of the jury.

## Prayer for Relief

Accordingly, Plaintiff prays that the Court grant it the following relief:

(a) That this matter be tried to a jury;

(b) That Plaintiff be awarded compensatory and general damages as well as consequential and special damages in an amount to be proven at trial;

(c) That Plaintiff be awarded pre-judgment interest;

(d) That Plaintiff recover its costs of litigation, including costs and reasonable attorneys' fees;

(e) That Plaintiff recover punitive damages in an amount determined by the enlightened conscience of the jury; and

(f) That the Court grant such other relief as the Court may deem fair and just.

Respectfully submitted this 29th day of April 2024.

>*/s/ Cary Ichter*
>Cary Ichter
>Georgia Bar No. 382515
>James W. Hawkins
>Georgia Bar No. 338767
>**ICHTER DAVIS LLC**
>400 Interstate N. Parkway SE
>Suite 860
>Atlanta, Georgia 30339
>404.869.7600
>cichter@ichterdavis.com
>jhawkins@ichterdavis.com
>
>*Attorneys for Spring City Acquisition Co., LLC*

## CERTIFICATE

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Book Antiqua and a point size of 13.

>*/s/ Cary Ichter*
>CARY ICHTER
>Georgia Bar No. 382515
>cichter@ichterdavis.com